**Appeal No. 23-55574**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

RELEVANT GROUP, LLC, 1541 WILCOX HOTEL, LLC, 6516 TOMMIE
HOTEL, LLC, and 6421 SELMA WILCOX HOTEL, LLC,

Plaintiffs/Appellants,

v.

STEPHEN "SAEED" NOURMAND, SUNSET LANDMARK INVESTMENT,
LLC, NOURMAND AND ASSOCIATES, and DOES 1-10,

Respondents/Appellees.

On Appeal from the United States District Court
for the Central District of California
No. 2:19-cv-05019-PSG-KS (Hon. Philip S. Gutierrez)

**APPELLANTS' OPENING BRIEF**

Jennifer S. Recine
Amit R. Vora
Donald J. Reinhard
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
(212) 506-1700
JRecine@kasowitz.com

*Counsel for Appellants Relevant Group,
LLC, 1541 Wilcox Hotel, LLC, 6516
Tommie Hotel, LLC, and 6421 Selma
Wilcox Hotel, LLC*

# CORPORATE DISCLOSURE STATEMENT

Plaintiffs–Appellants disclose the following under FRAP 26.1(a). Plaintiff–Appellant Relevant Group, LLC is a limited liability company and does not have any parent corporations.  Plaintiff–Appellant 1541 Wilcox Hotel, LLC is a limited liability company and does not have any parent corporations. Plaintiff–Appellant 6516 Tommie Hotel, LLC is a limited liability company and does not have any parent corporations.  Plaintiff–Appellant 6421 Selma Wilcox Hotel, LLC is a limited liability company and does not have any parent corporations. There is no publicly held corporation that owns 10% or more of any of the Plaintiff–Appellants.

Dated:  November 9, 2023

KASOWITZ BENSON TORRES LLP

*/s/ Jennifer S. Recine*
Jennifer S. Recine

*Counsel for Appellants Relevant Group, LLC, 1541 Wilcox Hotel, LLC, 6516 Tommie Hotel, LLC, and 6421 Selma Wilcox Hotel, LLC*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

JURISDICTIONAL STATEMENT ....................................................................3

CONSTITUTIONAL AND STATUTORY AUTHORITIES..................................4

ISSUES PRESENTED........................................................................................4

STATEMENT OF THE CASE............................................................................5

  I.   Factual Background....................................................................................5

    A.   Relevant's Plans and Defendants' Obstruction ..........................................5

    B.   The Sham Proceedings.................................................................................6

       1.   The Thompson Hotel ..........................................................................8

       2.   The Tommie Hotel...............................................................................15

       3.   Defendants' Exposed Motivations: They "Could Always Find Something to Challenge"........................................................................16

       4.   The Thompson and Tommie Settlements.............................................18

       5.   The Selma Hotel ................................................................................18

       6.   Defendants' Further Exposed Motivations: "You Know the Drill, It's Going to Take a Check to Make This Go Away" ...........................20

       7.   The Schrader Hotel ............................................................................21

       8.   Overall Trends ...................................................................................23

  II.     Procedural Background...........................................................................24

SUMMARY OF ARGUMENT .............................................................................28

STANDARDS OF REVIEW ................................................................................34

ARGUMENT ....................................................................................35

I.  The District Court Erred by Misapplying the *Noerr-Pennington*
    Doctrine and Granting Summary Judgment to Defendants on a
    Flawed Basis. ...........................................................................35

   A.    The Court Erroneously Declined to Apply the Series Exception
         to the *Noerr-Pennington* Doctrine. .........................................35

   B.    Under the Series Exception to *Noerr-Pennington*, Triable Fact
         Issues Preclude Summary Judgment.........................................41

      1.    Defendants Repeatedly and Reflexively Challenged Relevant's
            Projects. ..........................................................................41

      2.    Defendants Had No Genuine Interest in Their Claims' Merits
            or in Achieving a Successful CEQA Outcome. ..................43

      3.    Defendants' Objections Were Brought Without Regard to Merit
            and Did Not Succeed on the Merits. ...................................45

   C.   Even Under the Objectively-Baseless Exception, Summary Judgment
        Should Have Been Denied. ................................................52

II. The District Court Exceeded Its Authority in *Sua Sponte* Overruling
    the Court's Prior Summary Judgment Order.................................53

CONCLUSION .................................................................................56

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*2-Bar Ranch Ltd. P'ship v. United States Forest Serv.*,
   996 F.3d 984 (9th Cir. 2021) ............................................................34

*California Motor Transp. Co. v. Trucking Unlimited*,
   404 U.S. 508 (1972)............................................................30, 37, 38

*Canyon Cnty. v. Syngenta Seeds, Inc.*,
   519 F.3d 969 (9th Cir. 2008) ............................................................25

*City of Columbia v. Omni Outdoor Advert., Inc.*,
   499 U.S. 365 (1991)......................................................................*passim*

*Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.*,
   690 F.2d 1240 (9th Cir. 1982) ..........................................................39

*Delta Sav. Bank v. United States*,
   265 F.3d 1017 (9th Cir. 2001) ....................................................34, 53

*ERBE Elektromedizin GmbH v. Canady Tech. LLC*,
   629 F.3d 1278 (Fed. Cir. 2010) ........................................................43

*Fairbank v. Wunderman Cato Johnson*,
   212 F.3d 528 (9th Cir. 2000) ............................................................53

*In re Hanford Nuclear Reservation Litig.*,
   534 F.3d 986 (9th Cir. 2008) ............................................................34

*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*,
   806 F.3d 162 (3d Cir. 2015) ......................................................37, 39

*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*,
   806 F.3d 180 (3d Cir. 2015) ................................................31, 39, 51

*Kaufmann v. Kijakazi*,
   32 F.4th 843 (9th Cir. 2022) ............................................................54

*Keep Our Mountains Quiet v. County of Santa Clara*,
   236 Cal. App. 4th 714 (2015) ..............................................................7

v

*Peralta v. Dillard*,
  744 F.3d 1076 (9th Cir. 2014) ............................................................55

*Pit River Home & Agr. Co-op. Ass'n v. United States*,
  30 F.3d 1088 (9th Cir. 1994) .............................................34, 53, 55

*Primetime 24 Joint Venture v. Nat'l Broad., Co.*,
  219 F.3d 92 (2d Cir. 2000) ..............................................................37

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,
  508 U.S. 49 (1993).................................................................*passim*

*Save Our Big Trees v. City of Santa Cruz*,
  241 Cal. App. 4th 694 (2015) ........................................................6, 7

*Sever v. Alaska Pulp Corp.*,
  978 F.2d 1529 (9th Cir. 1992) ....................................................30, 37

*Soc. Techs. LLC v. Apple Inc.*,
  4 F.4th 811 (9th Cir. 2021) .............................................................34

*Sosa v. DIRECTV, Inc.*,
  437 F.3d 923 (9th Cir. 2006) ....................................................35, 36

*Suzuki Motor Corp. v. Consumers Union, Inc.*,
  330 F.3d 1110 (9th Cir. 2003) .........................................................34

*United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Const. Trades
  Dep't, AFL-CIO*,
  770 F.3d 834 (9th Cir. 2014) ..........................................................25

*United States v. Desert Gold Mining Co.*,
  433 F.2d 713 (9th Cir. 1970) ..........................................................53

*United States v. Koziol*,
  993 F.3d 1160 (9th Cir. 2021) .........................................................48

*USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades
  Council*,
  31 F.3d 800 (9th Cir. 1994) .....................................................*passim*

*Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*,
   728 F.3d 354 (4th Cir. 2013) ...............................................................31, 39, 46

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
   868 F.3d 132 (3d Cir. 2017) ..............................................................52

**Statutes and Rules**

8 U.S.C. § 1153(b) .............................................................................5

18 U.S.C. § 1962 ...............................................................................3

28 U.S.C. § 1291 ...............................................................................4

28 U.S.C. § 1292(b) ..........................................................................56

28 U.S.C. § 1331 ...............................................................................4

28 U.S.C. § 1337 ...............................................................................4

California Environmental Quality Act .................................................6

Federal Rule of Civil Procedure 59(e) ...............................................54

**Other Authorities**

Bryan A. Garner et al., *The Law of Judicial Precedent* (2016) ..............................56

# INTRODUCTION

Defendants–Appellees Saeed Nourmand, Sunset Landmark Investment LLC, and Nourmand & Associates ("N&A") (together, "Defendants") waged a multi-year campaign of delay, obstruction, and extortion against their competitors in the Hollywood real-estate market, Plaintiffs–Appellants Relevant Group, LLC, 1541 Wilcox Hotel LLC, 6516 Tommie Hotel LLC, and 6421 Selma Wilcox Hotel LLC (together, "Relevant"). Defendants' weapon of choice was the legal process itself: they filed a series of sham legal proceedings, without regard to the merits, to delay Relevant's nearby hotel-development projects, and they extorted millions of dollars and other costly concessions in exchange for ceasing their tactics. Defendants' counsel threatened to "always find something to challenge," while Nourmand warned: "you know the drill; it's going to take a check to make this go away." Although that conduct should have rendered Defendants liable to Relevant under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the district court granted summary judgment to Defendants on *Noerr-Pennington* grounds. To be sure, the *Noerr-Pennington* doctrine protects defendants from liability for legitimate litigation activity. But the doctrine contains an equally important exception for sham litigation activity that exploits process without regard to outcome. This case resides at the heartland of *Noerr–Pennington*'s sham exception, and a vacatur is necessary to vindicate the principle that the First Amendment is a shield, not a sword.

*First*, the district court erred by misapplying *Noerr–Pennington*'s sham exception. A plaintiff may establish that the exception applies either by showing (i) that the defendant brought an "objectively baseless" lawsuit with unlawful motive or (ii) that the defendant brought a "series" of proceedings "without regard to the merits" and for an unlawful purpose. Relevant relied on the series exception and adduced evidence that Defendants had filed a series of legal proceedings, without regard to merit, to delay the Thompson, Tommie, Selma, and Schrader hotel projects. Separately, in its affirmative case for RICO liability, Relevant adduced evidence that Defendants had committed a pattern of racketeering activity, and Relevant identified four predicate acts: extortion regarding the Thompson Hotel; extortion regarding the Tommie Hotel; attempted extortion regarding the Selma Hotel; and attempted extortion regarding the Schrader Hotel.

The court below, however, determined that Relevant had identified only four legal proceedings and had thus failed to trigger the series exception. But that holding contains a glaring conceptual error: the court conflated the predicate acts for RICO purposes (four) with the legal proceedings for *Noerr-Pennington* purposes (twenty). Each predicate RICO act encompassed multiple administrative and judicial proceedings. More fundamentally, the court was wrong to presume that the series exception is a mere counting exercise. A rational juror could have found that Defendants' voluminous sham litigation activity triggered the series exception. In

2

any event, even if the court was correct that the objectively-baseless exception to the *Noerr-Pennington* doctrine applies here (which Relevant denies), Relevant had adduced enough summary-judgment evidence for a rational juror to find that Defendants' conduct satisfied that exception, as well.

*Second*, the district court erred by overruling, without adequate justification, its own prior orders rejecting Defendants' *Noerr-Pennington* defense. The court had reached that conclusion three times, and after denying Defendants' motion for summary judgment, the court set this case for trial. But the case was transferred from Judge Wright II to Chief Judge Gutierrez, and six days before trial, the court vacated the prior denial of summary judgment. The court then granted summary judgment to Defendants on *Noerr-Pennington* grounds. Under the principles underlying the law-of-the-case doctrine, however, a new judge should overrule a prior judge's critical and repeated holding only if there has been an intervening change in the law, an emergence of new evidence, or a showing that the prior judge's ruling was "clearly erroneous" and "would work a manifest injustice." That standard—which is premised on the bedrock notion that courts, and not individuals, render legal holdings in our judicial system—was not satisfied here.

## JURISDICTIONAL STATEMENT

Relevant sued Defendants in the U.S. District Court for the Central District of California, alleging claims under 18 U.S.C. §§ 1962(b), 1962(c), & 1962(d). The

district court thus had federal-question jurisdiction over Relevant's claims under 28 U.S.C. §§ 1331 and 1337.

On May 24, 2023, the district court entered a final judgment in the form of an order granting summary judgment in favor of Defendants, disposing of all claims of all parties. (1-ER-2–26.) Plaintiffs timely filed a notice of appeal on June 23, 2023. (8-ER-1725.) This Court has jurisdiction under 28 U.S.C. § 1291 because Plaintiffs appeal from a final decision of the district court.

## CONSTITUTIONAL AND STATUTORY AUTHORITIES

Relevant constitutional and statutory authorities appear in the Addendum.

## ISSUES PRESENTED

1. Whether the district court substantively erred in granting summary judgment to Defendants on *Noerr-Pennington* grounds, where the court declined to apply the series exception only because it conflated the number of predicate acts for RICO purposes (four) with the number of sham proceedings for *Noerr-Pennington* purposes (twenty), where a rational juror could have found that Defendants' litigation activity was voluminous enough to trigger the series exception, and where, in any event, a rational juror could also have found that Defendants' litigation activity satisfied the objectively-baseless exception.

2. Whether the district court procedurally erred in *sua sponte* overruling its prior denial of summary judgment, and subsequently granting summary judgment

to Defendants, despite the absence of an intervening change in law, new evidence, or a showing that the prior critical holding by a different judge on the same court was clearly erroneous or would work a manifest injustice.

## STATEMENT OF THE CASE

## I.     Factual Background

### A.     Relevant's Plans and Defendants' Obstruction

Relevant is a real-estate and hospitality developer focused on high-end projects in the Hollywood neighborhood. (7-ER-1367–68 ¶¶ 9–11.) Over the past decade, Relevant has developed several hotel projects in the area, including the Thompson, Tommie, Selma, and Shrader projects. (7-ER-1368 ¶ 11.) While Relevant contributes capital to its project entities, Relevant is largely dependent on outside funding for its projects, including through bank loans, construction loans, and capital raised through the EB-5 program. (7-ER-1368 ¶ 12.) Under that program, foreign investors contribute capital to a specific project, and provided that the project creates ten local jobs per investor, the investors earn permanent residency visas. 8 U.S.C. § 1153(b)(5)(A). Due to its funding structure and the associated job-creation demands, Relevant is particularly vulnerable to project delays. (7-ER-1368 ¶ 12.)

Defendants are competing real-estate developers and hospitality-services providers based in the Hollywood neighborhood. (7-ER-1366 ¶¶ 4–5.) Defendant Nourmand is the principal of Defendant Sunset Landmark and the founder of

Defendant N&A. (7-ER-1366 ¶¶ 1–3.) Through Sunset Landmark, Nourmand owns five contiguous parcels of land in Hollywood, located at the northeast corner of Sunset and Schrader Boulevards ("Sunset Property"). (7-ER-1366 ¶ 4.) During the relevant period, Nourmand's Sunset Property contained a parking lot and multiple structures, including (i) a nightclub known as Boulevard3, which comprised 13,900 square feet of indoor floor space, a dance hall, and an outdoor courtyard with a full liquor license, live entertainment, and an approved occupancy load of 900 persons; and (ii) a nine-story building known as the Hollywood Athletic Club, which was a former hotel that was converted into an event space for weddings, banquets, and conferences. (7-ER-1367 ¶¶ 5–7, 1506:2–7, 1510:1–1511:9.) Nourmand has wanted to further develop his Sunset Property, including the parking lot, and he has pursued various opportunities to do so. (7-ER-1367 ¶ 8.)

## B.    The Sham Proceedings

Defendants launched a series of challenges against Relevant's hotel projects. The purported launching pad for these challenges was the California Environmental Quality Act ("CEQA"), Pub. Resources Code, § 21000 *et seq.* As detailed below, genuine environmental concerns did not drive Defendants' CEQA challenges.

Under CEQA, a municipal agency must conduct a preliminary review to determine whether CEQA applies to a proposed project. *Save Our Big Trees v. City of Santa Cruz*, 241 Cal. App. 4th 694, 704 (2015). If it does, the agency must conduct

an initial project study, the purpose of which is to "inform the choice between a negative declaration and an environmental impact report" ("EIR"). *Id.* "If there is no substantial evidence that the project or any of its aspects may cause significant effect on the environment, the agency prepares a negative declaration" ("ND"). *Id.* at 704–05. Alternatively, an agency prepares a mitigated negative declaration ("MND") "if the initial study identifies potentially significant effects on the environment but revisions in the project plans would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur and there is no substantial evidence that the project as revised may have a significant effect on the environment." *Id.* "Finally, if the initial study uncovers substantial evidence that any aspect of the project, either individually or cumulatively, may cause a significant effect on the environment, the agency must proceed to the third tier of the review process and prepare a full EIR." *Id.*

CEQA affords private citizens the right to bring a mandamus action against an agency that relies on an MND despite substantial evidence supporting a fair argument that a project will have significant environmental impacts even after mitigation. *Keep Our Mountains Quiet v. County of Santa Clara*, 236 Cal. App. 4th 714, 731 (2015). If such a CEQA litigant prevails, the Superior Court may order the agency to prepare an EIR and invalidate project approvals relying on the MND. *Id.*

### 1. The Thompson Hotel

The City of Los Angeles published an MND for the Thompson project in March 2015. (7-ER-1370 ¶ 18; 2-ER-183–85.) Yet Nourmand had started brainstorming pretextual objections to the Thompson project before the MND was published, and he decided to put his objections "into the record" before he received a copy of the MND. (7-ER-1370 ¶ 20; 2-ER-186–89, 190–92, 194).

Just two days after he received the MND, he told City officials that the "Mitigated Negative Declaration report should be rejected and instead the developer should be required to submit a full EIR." (7-ER-1370 ¶ 20; 2-ER-186–89, 219–22.) Thereafter, throughout the entitlements process, he sought to challenge and delay the project based on those pretextual concerns. (2-ER-105 ¶ 20.)

Nourmand purported to oppose the Thompson project based on concerns about noise impacts and the project's party atmosphere, despite his ownership interests in Boulevard3, a raucous nightclub, and the Hollywood Athletic Club, an event space. (7-ER-1371 ¶ 22; 2-ER-219–22, 223–40; 7-ER-1510:1–1511:9.)

Nourmand also purported to oppose the Thompson project based on concerns about traffic impacts, but he could neither articulate his specific traffic concerns nor why the MND's voluminous traffic study was inadequate. (7-ER-1371 ¶ 23; 2-ER-248, 289 ("Saeed was also very concerned about traffic, but couldn't seem to articulate why"); 7-ER-1549–50.) Although he complained that the Thompson

project would be "out of character" for the quiet neighborhood (2-ER-249), in his liquor license applications for Boulevard3, he described the Sunset Property as an ideal location for a nightclub because it was a "thriving, pedestrian-oriented area that is designated for regional commercial land use and which serves as a regional entertainment and tourist destination" (2-ER-297–311); *see also* 7-ER-1372 ¶ 25.

Although Nourmand claimed that he was concerned about the Thompson project's density, as measured by its floor-area-ratio ("FAR"), his FAR argument was based on a frivolous view that a decades-old zoning ordinance, which restricted the site's FAR, was "permanent." (7-ER-1372–73 ¶ 26.) Nourmand also demanded that Relevant not object to future development projects on the Sunset Property, including based on the same FAR argument. (7-ER-1372–73 ¶ 26; 2-ER-134 ("agree not to oppose in any forum" any "future development proposal that Sunset Landmark or any successor or assign may pursue"), 2-ER-360 ("they will not object to future surrounding developments").)

Nourmand has never been actively involved in environmental causes, nor is he anti-development. (7-ER-1373 ¶ 27.) In fact, he stated that he opposed the Thompson project because he did not want other projects to proceed on the same block where he intended to develop his Sunset Property one day. (7-ER-1373 ¶ 27.) He also stated that he did not want a project to proceed with restaurant- or bar-uses that would compete with the Boulevard3 and the Hollywood Athletic Club. (7-ER-

1373 ¶ 27; 2-ER-363 ("all of which will have a direct negative impact on our ability to develop our own project on the HAC land"), 2-ER-137 ("you have all the conviction of someone with entitlements, and we have the substantial doubts of someone without entitlements" (emphasis omitted)), 2-ER-139 ("Agreement to assist HAC" in "support of any project it undertakes" and "the HAC's own efforts to develop its property"), 2-ER-170–72, 173–82, 123:12–124:8, 2-ER-297–311; 7-ER-1417 ¶ 8.)

On March 11, 2015, Nourmand instructed N&A employees to attend a public hearing for the Thompson project, in order to present a false appearance of widespread community opposition. (7-ER-1373 ¶ 28.) N&A management circulated his directive to employees, stating that Nourmand "just wants some bodies there." (7-ER-1373 ¶ 28; 2-ER-367–69, 370–72.) On March 18, 2015, several N&A employees attended the hearing at Nourmand's direction and signed a petition stating that the Thompson project would negatively impact "our largely residential street"—even though none of those employees lived in Hollywood, and only a few worked from the Hollywood office. (7-ER-1373–74 ¶¶ 29–30; 2-ER-293, 367–69, 370–72, 373–75, 376–78.)

Relevant held several meetings with Nourmand during 2015 where he demanded design changes to the Thompson project. (7-ER-1374 ¶ 31; 2-ER-379–98; 3-ER-400–436, 437–39, 440–42, 443–45.) Relevant agreed to certain demands,

fearing Nourmand would continue to challenge and delay the project if they did not. (7-ER-1372 ¶ 31.) After one meeting, Relevant increased the project setbacks, eliminated the proposed nightclub from the roof, lowered the building's height, and reduced the number of rooms. (7-ER-1374 ¶ 31.) After another meeting, Relevant further reduced the building's height and reoriented the rooftop, moving the structures (the bar, restaurant, and fitness center) to the east so that they were farther away from Nourmand's Sunset Property. (7-ER-1374 ¶ 31.) These accommodations, however, could not appease Nourmand. (7-ER-1375 ¶ 34.)

The City adopted an MND and approved the Thompson project in October 2015; and the City published a revised MND in July 2015. (7-ER-1375 ¶ 33.) Despite Relevant's accommodations, Defendants objected to the Thompson project at the City Planning Commission hearing on September 10, 2015; they filed an administrative appeal on November 3, 2015, challenging the City Planning Commission's approval recommendation; and they objected at the City Planning and Land Use Management ("PLUM") hearing on January 26, 2016. (7-ER-1375 ¶ 34; 3-ER-449 (Zoning Administrator hearing); 3-ER-456 (City Planning Commission hearing); 3-ER-461 (PLUM Committee hearing); 3-ER-465 (City Council hearing); 2-ER-241–57 (administrative appeal).)

All those and other administrative challenges failed: the City granted final approvals for the project in early February 2016. (7-ER-1375 ¶ 35; 3-ER-449

(Zoning Administrator hearing); 3-ER-455 (City Planning Commission hearing); 3-ER-461 (PLUM Committee hearing); 3-ER-467–506, 507–09, 510–12.)

Separately, on February 3, 2016, Defendants submitted voluminous objections regarding the Thompson project to the City Council, immediately before public hearings—but those objections, too, were ultimately rejected. (3-ER-465 (City Council hearing); 7-ER-1540.)

Then, on March 3, 2016, Defendants filed a mandamus petition in Superior Court against the City, challenging the Thompson Hotel's MND and demanding that the City prepare a full EIR. (7-ER-1375–76 ¶ 36; 2-ER-312–50.) Defendants alleged numerous violations, claiming that the City had ignored "substantial evidence to support a fair argument that the Project may cause significant, unmitigable impacts to the environment, including but not limited to land use, transportation, traffic operational, circulation, emergency response times, parking, pedestrian safety, noise, air quality and health risks, historic resources, shade/shadow, public services, cumulative impacts and growth inducing impacts." (7-ER-1375–7 ¶ 36; 2-ER-319.)

Next, on May 5, 2016, Defendants filed a separate administrative proceeding against the Thompson project, this time with the Community Redevelopment Agency of Los Angeles. (7-ER-1376–77 ¶ 40.) Defendants opposed an owner-participation agreement between Relevant and the Agency and urged that the Agency could not "lawfully approve" the agreement based on the same meritless

arguments that Defendants had advanced during the entitlement process—that is, the arguments that the City could not amend a purportedly "permanent" FAR limitation and that noise from the project's "massive outdoor party space" rendered the MND invalid. (7-ER-1376–77 ¶ 40; 2-ER-351–58; 3-ER-513–22.) This challenge was rejected. (7-ER-1375 ¶ 34.)

Later, on August 11, 2016, Defendants filed another administrative proceeding, this time with the Los Angeles Department of Building Safety, arguing that the Department had "no lawful basis" to process permits and that the Department was obligated to revoke an already issued demolition permit. (7-ER-1377 ¶ 41; 4-ER-559, 771.) Yet when Defendants lodged this challenge, Relevant had already completed the authorized razing work—meaning that Defendants sought to invalidate a demolition permit for a demolished building. (7-ER-1377 ¶ 41.) The Department denied the challenge. (7-ER-1377 ¶ 42; 4-ER-559, 767) ("demolition and sewer cap work was completed, and a final inspection for these permits was approved on April 6, 2016").)

On October 18, 2016, Defendants filed an administrative proceeding with the Los Angeles Director of Planning, arguing that the Department of Building Safety had erred—but the Director denied that challenge. (7-ER-1377–78 ¶ 43.)

On February 17, 2017, Defendants filed an administrative proceeding with the Central Los Angeles Area Planning Commission, arguing that the Director had

erred. (7-ER-1377–78 ¶ 43.) The Commission denied that challenge in a report sharply criticizing the fundamental premise of Defendants' objection. (7-ER-1377–78 ¶ 43.) And on May 23, 2017, Defendants' counsel appeared again before the Commission to appeal the Commission's denial. The Commission affirmed the denial. (7-ER-1377–78 ¶ 43; 4-ER-763, 765, 767, 772–74.)

Meanwhile, the Superior Court litigation moved forward, with Defendants filing their briefs on March 28, 2017. (7-ER-1378 ¶ 44.) That briefing, however, addressed only land use, noise, and traffic impacts, while abandoning the other eleven categories that the petition had raised. (7-ER-1378 ¶ 44.) And on the three impacts that were addressed, Defendants' arguments were frivolous and unsupported by relevant evidence. (7-ER-1378–79 ¶¶ 44–47, 1548–52.)

For example, for noise impacts, Defendants relied solely on an outdated and inapplicable letter by one noise consultant. (7-ER-1549.) The consultant's letter was prepared before significant design changes were made to the Thompson project and before the revised MND was published, which included additional noise mitigation measures. (7-ER-1549.) The consultant's letter ignored several substantial new design changes and mitigation measures related to noise, and Defendants never offered an updated study. (7-ER-1549.)

For traffic impacts, Defendants neither offered nor cited any competing traffic analysis. (7-ER-1549–50.) Instead, Defendants argued that the City failed to address

traffic questions, based on its mischaracterization of a single letter from Caltrans. (7-ER-1549–50.) In the letter, Caltrans noted that it had not received any technical appendices to the MND and asked the City to prepare a traffic study, if one had not been prepared already. (7-ER-1549–50.) Defendants failed to acknowledge that the City had responded to Caltrans—later that day—and had provided the appendices, including the traffic study. (7-ER-1549–50; 5-ER-827–30, 5-ER-831–33.)

### 2. The Tommie Hotel

The City circulated an MND for the Tommie project in December 2016. (7-ER-1380 ¶ 48; 5-ER-834–36, 837–39.) On January 25, 2017, Defendants submitted objections against the Tommie project to the City Planning Commission. (7-ER-1380 ¶ 50; 5-ER-840–58.) The vast majority of the content in Defendants' January 25, 2017 submission against the Tommie project was copied and pasted from Defendants' August 12, 2016 submission against the Thompson project. (7-ER-1563 (noting that, in Appendix D, the "letters are highlighted to show repetitions from comments on prior hotels"), 1565–82 (highlighted version of Tommie letter showing content copied from Thompson letter).) Those objections were rejected. (7-ER-1382 ¶ 62; 5-ER-925–55, 956–59, 960–64.)

On February 15, 2017, Defendants administratively challenged the Tommie project in the City's Planning and Land Use Management Committee. (2-ER-118–20.) In a follow-up submission to the Committee dated April 25, 2017—which was

854 pages and submitted the day of a hearing—Defendants referred to the project as a "nuisance-generating, party hotel," and "an ill-conceived, noise generating nuisance 'party hotel' that should have never come out of a planning department conference room." (7-ER-1382 ¶ 58; 5-ER-892, 897, 924; 7-ER-1539.) The challenge was ultimately denied. (7-ER-1321 ¶ 62; 5-ER-925–55, 956–59, 960–64.)

On May 5, 2017, Defendants submitted objections against the Tommie project to the City Council. (7-ER-1382 ¶ 61; 5-ER-866; 7-ER-1539.) Those objections were rejected. (7-ER-1382 ¶ 62; 5-ER-925–55, 956–59, 960–64.)

On June 9, 2017, Defendants filed a mandamus petition in Superior Court against the City, challenging the Tommie Hotel's MND and demanding that the City prepare a full EIR, and as with the Thompson Hotel, raising a scattershot of unsubstantiated allegations. (7-ER-1384–85 ¶ 71; 5-ER-1010–11 ¶ 83.)

### 3. Defendants' Exposed Motivations: They "Could Always Find Something to Challenge"

During an April 2017 phone call, Relevant's counsel Matt Hinks had asked Defendants' counsel Robert Silverstein what Defendants' legal fees were to date and how much of a recent $2 million demand was "blood money." (7-ER-1381 ¶ 57, 1366 ¶ 7, 1410.) Silverstein responded that $500,000 was meant to cover attorneys' fees and did not dispute that the remainder was "blood money." (7-ER-1381; 5-ER-885; 7-ER-1383 ¶ 57, 1408 ¶ 7, 1410.)

In May 2017, Relevant representatives and counsel met with Defendants' representatives and counsel, and Hinks remarked that if the City elected to prepare an EIR, Defendants would be entitled to nothing. (7-ER-1383 ¶ 64, 1408 ¶ 9, 1402 ¶ 8.) In response, Silverstein commented that he would challenge the EIR, if the City elected to prepare one, and that he "could always find something else to challenge." (7-ER-1383 ¶ 64, 1408 ¶ 9, 1402 ¶ 8.) Relevant understood Silverstein's comment to be a threat of indefinite delay against its projects, regardless of the merits of any administrative or judicial proceeding, unless Relevant agreed to meet Defendants' demands, including the monetary payment and other costly design changes. (7-ER-1383 ¶ 65, 1408 ¶¶ 9–10, 1402 ¶ 8.)

In June 2017, an agent of Defendants emailed the following to an agent of Relevant regarding settlement discussions: "Our perspective is that, if we are successful in the litigation, and assuming that you successful [sic] to move your project forward with an EIR, the developer needs an additional two years to process the project., [sic] with many of the same challenges to address going forward." (7-ER-1386 ¶¶ 77–78; 2-ER-362–66; 7-ER-1417 ¶¶ 5–6, 1419–23.) The email continued: "My hope is that once there is a hard pencil costing assessment done by the developer, that you will see what that balance looks like, and we will have a productive discussion going forward." (7-ER-1386 ¶¶ 77–78; 2-ER-362–66; 7-ER-1417 ¶¶ 5–7, 1419–23.) Relevant understood those comments to be a threat of

continued delay to its projects, and a suggestion that Relevant should calculate the financial cost of those further delays when considering Defendants' demands, including the monetary demand. (7-ER-1386 ¶¶ 77–78, 1417 ¶¶ 5–7.)

### 4. The Thompson and Tommie Settlements

In late August 2017, Relevant and Defendants reached an agreement under which Defendants would cease their proceedings regarding the Thompson and Tommie projects in exchange for $5.5 million and certain design changes. (7-ER-1387 ¶ 81; 2-ER-125:163:19–164:19; 2-ER-127:189:19–24.) As part of the settlement agreements, Relevant was required to support any development plans that Defendants pursued on their own property. (7-ER-1387 ¶ 83; 2-ER-136–69; 5-ER-1033–1071.) The parties formally executed the settlement in January 2018, and Relevant made its final payment in March 2018. (7-ER-1387 ¶ 84; 6-ER-1253.)

### 5. The Selma Hotel

The City published the MND for the Selma project in late December 2017. (7-ER-1387 ¶ 84; 5-ER-1091–93, 1094–96.) Defendants automatically and promptly prepared their challenge. (7-ER-1387 ¶ 87; 6-ER-1099.)

On March 23, 2018, Defendants submitted objections against the Selma project to the City Planning Commission. (7-ER-1387 ¶ 90; 5-ER-867–71.) The vast majority of the content in Defendants' March 23, 2018 submission against the Selma project was copied and pasted from prior submissions against the Tommie project.

(7-ER-1563 (noting that, in Appendix D, the "letters are highlighted to show repetitions from comments on prior hotels"); 6-ER-1101–25.) In the March 23, 2018 letter, Sunset referred to the Selma project as a "nuisance-generating, 'party hotel,'" an "alcohol-soaked 'Animal House' party hotel," a "noise-generating party hotel," and "an ill-conceived, noise generating nuisance 'party hotel' that should have never come out of a planning department conference room." (7-ER-1388 ¶ 90; 6-ER-1103, 1105, 1124.) That passage was lifted from Defendants' prior Tommie filing.

On July 12, 2018, Defendants made further objections against the Selma project at a City Planning Commission hearing. (7-ER-1372 ¶ 25.) The City ultimately rejected the objections. (7-ER-1395 ¶ 125; 6-ER-1272–82.)

On September 6, 2018, Defendants filed an administrative proceeding against the Selma Project with the City Planning and Land Use Management Committee. (7-ER-1388 ¶ 89; 6-ER-1253–55.) In late November, Defendants attended public hearings before the Committee to state their objections, and filed a 468-page objection report. (7-ER-1393 ¶ 119, 1527–54; 6-ER-1085; 7-ER-1545–52.) The administrative challenges were denied. (7-ER-1395 ¶ 125; 6-ER-1272–82.)

On April 2, 2019, Defendants filed a mandamus petition in Superior Court against the City, challenging the Selma project's approval and demanding that the City prepare a full EIR—and again raising a scattershot of unsubstantiated CEQA grounds. (7-ER-1395 ¶ 126; 6-ER-1290.) Defendants protracted the litigation with a

flurry of procedural motions, and in January 2021, the court issued an interlocutory order and remand. (7-ER-1397–98 ¶¶ 133–35; 7-ER-1546–48, 1554–58; 6-ER-1297–1331.) The court held that Defendants had failed to raise fair argument that there were significant environmental impacts related to greenhouse gasses, noise, transportation, parking, public services, or external piecemealing, but issued a remand for the City to clarify technical issues in the MND related to air quality impacts and the baseline used in its internal piecemealing analysis; the court did not order the City to prepare an EIR or revoke approvals. (7-ER-1398 ¶ 135; 7-ER-1554–58; 6-ER-1297–1331.)

On March 26, 2021, Defendants noticed an appeal in the Court of Appeal, Second Appellate District, but the court dismissed the appeal in June 2021 because Defendants had futilely attempted to appeal from a non-appealable order. (7-ER-1398 ¶ 137, 1558.)

### 6. Defendants' Further Exposed Motivations: "You Know the Drill, It's Going to Take a Check to Make This Go Away"

After Relevant submitted the final settlement payment in March 2018, but just before Defendants submitted their March 23, 2018 letter regarding the Selma project, Relevant's co-founder Richard Heyman texted Nourmand to meet for lunch, and Nourmand agreed. (7-ER-1388 ¶ 89; 6-ER-879–80.) Heyman arrived to the lunch with the letter in hand and asked Nourmand why he was opposing Relevant's projects again. (7-ER-1404 ¶ 15.) In response to Heyman's question, Nourmand

said: "you know the drill, it's going to take a check to make this go away." (7-ER-1404 ¶ 15.) Heyman understood Nourmand's "you know the drill" comment as a threat that Nourmand would continue to challenge Relevant's projects going forward. (7-ER-1404 ¶ 15.)

### 7. The Schrader Hotel

By the time of the lunch meeting between Heyman and Nourmand, Relevant had acquired an interest in another hotel project that was going through the entitlement process: the Schrader project. (7-ER-1389 ¶ 97, 1403 ¶ 13, 1425–26 ¶¶ 4–5; 6-ER-1126–86.)

Relevant had entered into a purchase agreement with KOAR Institutional Advisors ("KOAR") to purchase the property for the Schrader project for $21 million. (7-ER-1389 ¶ 98, 1403 ¶ 13, 1426 ¶ 5; 6-ER-1126 ¶ 5; 6-ER-1126–86.) Under the purchase agreement, Relevant agreed to pay a $1 million nonrefundable deposit for the Schrader project and the remainder of the closing price was due by late September 2018 (7-ER-1389 ¶ 99, 1404 ¶ 18, 1426 ¶ 6; 6-ER-1126–87.)

The City completed the MND for the Schrader project in April 2018. (7-ER-1390 ¶ 101; 6-ER-1187–89.) On July 13, 2018, Defendants submitted an objection letter regarding the Schrader project to the Advisory Agency of the City Planning Commission. (7-ER-1391 ¶ 105; 6-ER-1222–23.) The vast majority of the content in Defendants' July 13, 2018 letter against the Schrader project was copied and

pasted from the letter that Defendants had submitted on March 23, 2018 against the Selma project. (7-ER-1391 ¶ 106; 7-ER-1563 (noting that, in Appendix D, the "letters are highlighted to show repetition from comments on prior hotels"); 7-ER-1631.) In the letter, Defendants referred to the Schrader project as a "nuisance-generating, 'party hotel,'" an "alcohol-soaked 'Animal House' party hotel," a "noise-generating party hotel" and "an ill-conceived, noise generating nuisance 'party hotel' that should have never come out of a planning department conference room." (7-ER-1391 ¶ 107; 6-ER-1192, 1195, 1200, 1214.) Once again, that language was lifted from prior letters.

In July 2018, a managing member of KOAR sent Heyman an email regarding Defendants' objections: "Looks like [Saeed's] business plan is to make money off his neighbors." (7-ER-1391, 1426–27 ¶ 11, 1430–31; 6-ER-1215–16.)

On August 10, 2018, Defendants filed an administrative appeal against the Schrader project to the City Planning Use and Management Committee. (7-ER-1391; 6-ER-1217–44; 7-ER-1427 ¶ 12, 1432–59.)

In late September 2018, Relevant failed to make the closing payment to complete its acquisition of the Schrader property. (7-ER-1366 ¶ 111.) Under the purchase agreement's terms, KOAR terminated the agreement and Relevant lost its $1 million deposit. (7-ER-1366 ¶ 111.) As of the termination letter's date, Relevant no longer possessed an interest in the Schrader project. (7-ER-1366 ¶ 111, 1427 ¶ 13,

1404 ¶ 18; 6-ER-1253–55.)

KOAR's managers were concerned that Nourmand would try to extort money from the Schrader project, given Nourmand's pattern of opposing projects associated with Relevant and Nourmand's belief that the Schrader project was associated with Relevant. (7-ER-1427 ¶¶ 10–11.) So, after the purchase agreement was terminated, the KOAR managers contacted Nourmand, and met him in person, clarifying that Relevant was no longer associated with the Schrader project and that Nourmand could not use legal challenges to extract money from the project, as KOAR was not dependent on outside investors and was not under financial pressure to begin construction. (7-ER-1427 ¶¶ 13–14; 6-ER-1256–62.) Shortly after the meeting, Defendants withdrew their Schrader challenge. (7-ER-1427 ¶ 15; 6-ER-1263–71.)

## 8.    Overall Trends

In total, Defendants filed twenty legal proceedings regarding Relevant's projects. *See* 2-ER-118 (illustrating nineteen columns, but missing one initial column for the objections submitted to the City Planning Commission regarding the Thompson). During the administrative processes for the Thompson, Tommie, and Selma hotels, Defendants submitted more than 4,000 pages of comment letters challenging Relevant's projects. (7-ER-1540–42.) Thirteen of those comment letters were submitted on the same day as a hearing or the day before. (7-ER-1540–42.) The average length of those thirteen comment letters was 297 pages. (7-ER-1540–

42.) Seven comment letters were more than 300 pages long. The longest comment letter—submitted against the Selma project on November 21, 2018—was 841-pages long. (7-ER-1540–42.) Further, during the administrative processes for the Thompson, Tommie, and Selma projects, Defendants requested to postpone or delay hearings on at least five occasions. (7-ER-1540–42.)

Notably, Nourmand trained his focus on Relevant, ignoring other development projects in the area. (7-ER-1397 ¶ 131.) In September 2018, the City Planning Commission held a hearing on the Crossroads development project, which proposed an 8.34-acre development that included over 1.3 million square feet of residential, hotel, and commercial uses at a site that was just two blocks away from the Sunset Property. (7-ER-1397 ¶ 131; 6-ER-1293–96.) Nourmand did not show up to the hearing to oppose the Crossroads project. (7-ER-1397 ¶ 131.)

In contrast, during December 2018 and January 2019, Defendants' counsel, Silverstein's law firm, drafted a letter to local, state, and federal prosecutors, requesting that the prosecutors investigate the City's approvals of Relevant projects in Hollywood. (7-ER-1397 ¶ 123.) The letter contained unsubstantiated allegations and the requested investigation was not opened. (7-ER-1397 ¶ 123.)

## II.  Procedural Background

Relevant filed this suit against Defendants, bringing civil RICO claims based on Defendants' acts of extortion and attempted extortion. (8-ER-1656–78 ¶¶ 67–

118.) To satisfy the RICO element concerning a "pattern" of racketeering activity, Relevant alleged four predicate acts: extortion regarding the Thompson project; extortion regarding the Tommie project; attempted extortion regarding the Selma project; and attempted extortion regarding the Schrader project. (8-ER-1671–78 ¶¶ 67–118.) *See also Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008) (noting that "a 'pattern of racketeering activity' requires at least two predicate acts") (citing 18 U.S.C. § 1961(5)); *United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Const. Trades Dep't, AFL-CIO*, 770 F.3d 834, 837 (9th Cir. 2014) ("'Racketeering activity' includes, *inter alia*, 'any act which is indictable' under the Hobbs Act, 18 U.S.C. § 1951, or 'any act or threat involving … extortion, … which is chargeable under State law.'") (quoting 18 U.S.C. §§ 1961(1)(A), (B)).

Defendants moved to dismiss, arguing that their acts were immunized from liability under the *Noerr-Pennington* doctrine, which protects legitimate litigation activity. The district court rejected that argument, holding that Relevant had adequately pleaded the doctrine's sham exception by alleging that Defendants' CEQA suits were "brought pursuant to a policy of starting legal proceedings without regard to the merits." (1-ER-92–93.) The court, however, granted the Defendants' motion to dismiss with leave to amend because Relevant had not pleaded the enterprise element of its RICO claims. (1-ER-100.)

Relevant amended its pleading (8-ER-1679), and Defendants again moved to

dismiss, again urging that *Noerr-Pennington* immunized their acts. The court adhered to its prior decision, holding that the series exception applied and *Noerr-Pennington* doctrine did not protect Defendants as a matter of law, and that Relevant's pleading stated RICO claims. (1-ER-76–82.)

After the parties completed discovery, Defendants moved for summary judgment, again urging that *Noerr-Pennington* immunized their acts. In a forty-three page opinion issued in July 2022, the district court denied Defendants' motion, ruling in pertinent part that: (i) "litigation-based extortion" can be a "predicate act for purposes of RICO" (1-ER-50); (ii) the series exception applies to determine whether Defendants' litigation-based extortion is immunized from liability under the *Noerr-Pennington* doctrine (1-ER-52–53); and (iii) the evidence "sufficiently substantiates" Relevant's allegations that Defendants brought their legal challenges "pursuant to a policy of starting legal proceedings without regard to the merits and for an unlawful purpose" (1-ER-54–55); (*see also* 1-ER-55–61) (continuing analysis)). Accordingly, the court held that Defendants had failed to show "that the applicability" of the series exception is "beyond genuine dispute," and that, as a result, Defendants were "not entitled to summary judgment on this ground." (1-ER-61.) Given this order, the parties proceeded to prepare for trial, with a final pretrial conference set for late October 2022. (7-ER-1462.)

In early September 2022, the case was "transferred to the calendar of Chief

Judge Gutierrez for all further proceedings." (7- ER-1460.) The parties continued to prepare for trial, including by submitting pre-trial briefing, exhibit lists, motions *in limine*, and proposed jury instructions, and holding a final pretrial conference on January 6, 2023 for a trial set to commence on January 26, 2023. (7-ER-1460.)

On January 20, 2023—a mere six days before trial was set to commence— Chief Judge Gutierrez issued an order "sua sponte vacat[ing] the trial date and order[ing] the parties to file supplemental briefing and related documents." (1-ER-27.) In particular, the court directed the parties "to rebrief the *Noerr-Pennington* doctrine and explain which sham exception test should be applied under the circumstances of this case," (1-ER-29), even though the court's prior orders had already and comprehensively addressed this issue. The court also asked the parties to address how a new finding that some or all of Defendants' petitioning activities were not shams would affect RICO liability, and it asked Relevant to clarify the predicate acts that it intended to prove at trial. (1-ER-29.)

The parties filed supplemental briefing, and Relevant filed a chart outlining four predicate RICO acts and, underneath each predicate act, several administrative and judicial proceedings that comprised the "series" of proceedings for *Noerr-Pennington* purposes. (2-ER-118.)

On May 24, 2023, the court heard oral argument; then, on the same day, the court issued an order to "overrule[] its prior summary judgment order denying

Defendants' motion for summary judgment." (1-ER-11.) The district court reached this result by equating the number of RICO predicate acts with the number of sham legal proceedings. (1-ER-14 ("Relevant claim four predicate acts"); 1-ER-19 ("The Court finds on the record that Relevant has alleged only four sham activities—those being the four alleged predicate acts.").) The court then relied on this equivalence to hold that Relevant had alleged only four sham legal proceedings, which was not enough to trigger the series exception to the *Noerr-Penning* doctrine. (1-ER-20.) Finally, the court held that Defendants' conduct did not fall within the objectively-baseless exception to the *Noerr-Pennington* doctrine. (1-ER-25.) On that ground, the court granted summary judgment to Defendants. (1-ER-26.)

This appeal followed.

## SUMMARY OF ARGUMENT

This Court should vacate the district court's grant of summary judgment to Defendants. The court's second summary-judgment decision is both substantively and procedurally erroneous.

**I.** Substantively, the district court's grant of summary judgment to Defendants is predicated on the flawed premise that the *PREI* (or "objectively-baseless") exception to the *Noerr-Pennington* doctrine, rather than the *USS-POSCO* (or "series") exception, governs this case. The court reached that incorrect premise by

conflating (i) the number of predicate acts for RICO purposes with (ii) the number of administrative and judicial proceedings for *Noerr-Pennington* purposes.

The *Noerr-Pennington* doctrine immunizes defendants from liability for legitimate litigation activities. But sham litigation activities do not enjoy this First Amendment protection. Under the *PREI* exception to the doctrine, a defendant loses the protection when it files an objectively baseless proceeding with an unlawful motive. *See Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993) ("*PREI*")). Under the *USS-POSCO* exception to the doctrine, a defendant loses the protection when it files a *series* of proceedings without regard to their merits and for an unlawful purpose. *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades Council*, 31 F.3d 800, 811 (9th Cir. 1994).

The district court should have applied the *USS-POSCO* exception—which would have required Relevant to show that Defendants commenced a series of proceedings without regard to merit, without needing to show that each proceeding was objectively baseless. But the interaction between Relevant's affirmative case for liability, and Defendants' affirmative defense, caused the court to err. Relevant alleged, and adduced evidence to establish, that Defendants had operated an enterprise that initiated a series of legal challenges to Relevant's hotel-development projects under CEQA in order to delay construction and pressure Relevant to pay money and make non-environmental alterations and concessions, in violation of

RICO. To establish a pattern of racketeering activity for RICO purposes, Relevant identified four predicate acts: (i) extortion related to the Thompson Hotel; (ii) extortion related to the Tommie Hotel; (iii) attempted extortion related to the Selma Hotel; and (iv) attempted extortion related to the Schrader Hotel.

Although the district court read Relevant's pleadings and submissions as identifying four sham legal proceedings, which according to the court was inadequate to constitute a series and trigger the *USS-POSCO* exception, the court overlooked that Relevant had identified four predicate acts for RICO purposes, and that each predicate act involved multiple sham legal proceedings. A predicate act under RICO is a broad category. As this Court has held, "collective conduct" pushing toward "a singular purpose," even if it "happened to involve more than one act taken to achieve that purpose," can be a single predicate act under RICO. *See Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1535 (9th Cir. 1992)).

In fact, Relevant adduced summary-judgment evidence showing that Defendants' had initiated years of challenges at numerous levels of government, raising virtually every conceivable argument, and using virtually every conceivable procedural tool to drag out proceedings—not a one-off civil suit. That lengthy, multifarious process was the weapon that Defendants abused. Doctrinally, when determining whether a party has raised a "series" of challenges, the relevant unit is "proceedings," not "lawsuits." *See USS-POSCO*, 31 F.3d at 811; *accord California*

*Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 511 (1972). Defendants' administrative challenges must count. As a result, this case involves twenty proceedings, placing it squarely within *USS-POSCO*'s ambit.

In addition, the court erred in presuming that the *USS-POSCO* exception is a mere counting exercise. The rubric is volume, not number, and this Court should conduct a "holistic" analysis of Defendants' conduct to determine whether they abused legal process. *See Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27,* 728 F.3d 354, 363–64 (4th Cir. 2013). Where, as here, the defendants have engaged in a pattern of seeking to block a rival from obtaining government approvals, just four administrative challenges have triggered *USS-POSCO*'s application. *See Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.,* 806 F.3d 180, 801 (3d Cir. 2015).

Under the *USS-POSCO* exception, moreover, there is ample evidence for a reasonable jury to conclude that Defendants sought to extract property from Relevant through governmental process without regard to that process's outcome— thus precluding summary judgment for Defendants on *Noerr-Pennington* grounds. Defendants were not acting as environmental advocates hoping to attain more thorough environmental review by the City. They have no record of interest in environmental issues. Rather, they are competitors with Relevant in the Hollywood real-estate development space. Although they complained that Relevant's projects

would attract a partygoing crowd, that (almost comically) hypocritical complaint only reinforced the lack of merit to their grievances: Defendants owned a nearby nightclub and event hall and were strongly motivated to keep business flowing to their own properties. Thus, to stymie Relevant's four competing hotel projects, they repeatedly and reflexively filed boilerplate, pretextual, and baseless objections throughout the City's entitlements and approvals process. All those objections were rejected. They then sought judicial review using the same template and scattershot approach, listing every category in the CEQA guidelines, and attempted to protract those proceedings. Next, they demanded a cash payment from Relevant (which is *not* an available outcome from a CEQA suit) in exchange for (i) abandoning their claims for further environmental review by the City (the ostensible goal of a CEQA suit) and (ii) barring Relevant from challenging Defendants' projects on CEQA grounds (which undermines CEQA's purpose). When Relevant offered to complete an environmental impact report ("EIR") for the Thompson project—the relief purportedly sought in the *Thompson* CEQA litigation—Defendants made clear that they would challenge, sight unseen, any EIR too. As Defendants' attorney put it, he could always "find something else to challenge." And when Relevant's principal met Defendants' principal to understand Defendants' motivations, the latter openly stated: "you know the drill, it's going to take a check to make this go away."

In any event, even if the *PREI* approach applies, Defendants' conduct satisfies that exception, as well. Their proceedings were objectively meritless. That Relevant paid the demanded ransom to stop Defendants' CEQA challenges is not evidence of the claims' merit, but rather confirms that Defendants successfully abused the legal process as a weapon to extort Relevant irrespective of the likely outcome. That view is confirmed by the fact that Defendants unilaterally withdrew their challenge to the fourth project, the Schrader hotel, once Defendants realized that Relevant was no longer involved and the project's owners could not be shaken down.

**II.** Procedurally, the district court erred in granting summary judgment to Defendants because the court abused its discretion in *sua sponte* overruling itself. The court had denied Defendants' *Noerr-Pennington* defense, holding that the series exception applied, three separate times—twice at the pleading stage and once at the summary-judgment stage. The court set the case for trial. But the case was then transferred from Judge Wright II to Chief Judge Gutierrez, and a mere six days before trial, the court stayed trial and ordered new briefing. The court then reversed itself and granted summary judgment to Defendants on *Noerr-Pennington* grounds, for the mistaken reasons described above. Yet under the law-of-the-case doctrine—or, at a minimum, the principles underlying the doctrine—one judge may reverse a critical holding rendered by a prior judge in the same case only if there is adequate justification for such a reversal, such as an intervening change in the law, the

emergence of new evidence, or a showing that the prior holding was clearly erroneous and would generate manifest injustice. *See, e.g.*, *Pit River Home & Agr. Co-op. Ass'n v. United States*, 30 F.3d 1088, 1094 (9th Cir. 1994). That standard was not met here. There was no change in the law, there was no new evidence, and given the foregoing analysis of the series exception and its applicability here, the prior ruling was not *clearly* erroneous.

## STANDARDS OF REVIEW

This Court reviews *de novo* the district court's decision to grant summary judgment. *2-Bar Ranch Ltd. P'ship v. United States Forest Serv.*, 996 F.3d 984, 990 (9th Cir. 2021). This Court's review is governed by the same standard used by the trial court. *Suzuki Motor Corp. v. Consumers Union, Inc.*, 330 F.3d 1110, 1131 (9th Cir. 2003). That is, this Court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are genuine issues of material fact and whether the district court correctly applied the substantive law. *See Soc. Techs. LLC v. Apple Inc.*, 4 F.4th 811, 816 (9th Cir. 2021).

If a district court's holding on an affirmative defense is a legal issue, this Court's review is *de novo*. *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1000 (9th Cir. 2008). And this Court "review[s] for abuse of discretion a district judge's decision to reconsider an interlocutory order by another judge of the same court." *Delta Sav. Bank v. United States*, 265 F.3d 1017, 1027 (9th Cir. 2001).

# ARGUMENT

## THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT TO DEFENDANTS SHOULD BE VACATED.

**I.     The District Court Erred by Misapplying the *Noerr-Pennington* Doctrine and Granting Summary Judgment to Defendants on a Flawed Basis.**

    **A.     The Court Erroneously Declined to Apply the Series Exception to the *Noerr-Pennington* Doctrine.**

Where, as here, a plaintiff brings a RICO action based on litigation activity, a defendant may urge that its activity was protected under the *Noerr-Pennington* doctrine. *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 931 (9th Cir. 2006). That doctrine, which derives from the First Amendment's guarantee of the right to petition, immunizes legitimate litigation activity from liability. *See id.* (citing U.S. Const. amend. I). Still, a defendant enjoys no protection under the First Amendment when it weaponizes "governmental process itself—as opposed to the *outcome* of that process." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991). This is "the 'sham' exception" to the *Noerr-Pennington* doctrine. *Id.* The exception recognizes that unscrupulous parties should not be permitted to wield the "costly, distracting, and time consuming" nature of administrative and judicial proceedings to accomplish their ends. *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades Council,* 31 F.3d 800, 811 (9th Cir. 1994).

When the defendant's conduct comprises only initiating a "single" legal proceeding, this Court applies the *PREI* approach, which asks whether the

proceeding was "objectively baseless" and whether the defendant's motive in bringing it was unlawful. *See Sosa*, 437 F.3d at 938 (quoting *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993) ("*PREI*")). When the defendant employs a "series" of proceedings, this Court applies the *USS-POSCO* approach, which asks whether the proceedings were "brought pursuant to a policy of starting" them "without regard to the merits and for an unlawful purpose." *Id.* (quoting *USS-POSCO*, 31 F.3d at 811). In all its formulations, however, the touchstone for *Noerr-Pennington* remains the same: whether the defendant is using governmental process itself—and its attendant "expense and delay"—to achieve the defendant's objectives. *See Omni*, 499 U.S. at 380. If so, the exception applies.

In its second summary-judgment decision, the district court presumed that Relevant had identified "only four sham activities," and that as a result, the *USS-POSCO* approach did not apply. (1-ER-19–20.) But that holding conflated two distinct issues: (i) predicate acts for RICO purposes; (ii) sham proceedings for *Noerr-Pennington* purposes. To be sure, Relevant identified four predicate acts to support Defendants' RICO liability: (i) extortion related to the Thompson Hotel development; (ii) extortion related to the Tommie Hotel development; (iii) attempted extortion related to the Selma-Wilcox Hotel development; and (iv) attempted extortion related to the Schrader Hotel project. Plaintiffs identified these predicate acts to establish, under RICO, a "pattern of racketeering activity involving more than

36

one transaction." *See Sever v. Alaska Pulp Corp.,* 978 F.2d 1529, 1535 (9th Cir. 1992)). But each predicate act under RICO involved multiple sham proceedings under *Noerr-Pennington*. Indeed, this Court in *Sever* recognized that a predicate act under RICO is a broad category. As this Court held, "collective conduct" pushing toward "a singular purpose," even if it "happened to involve more than one act taken to achieve that purpose," can be a single predicate act for RICO purposes. *See id.*

Focusing on sham proceedings, rather than on predicate acts, yields a number much greater than four—in fact, twenty. See *supra* at 23. "[P]roceedings" includes "lawsuits and other legal actions*." USS-POSCO,* 31 F.3d at 811. Thus, administrative objections and challenges also count. *Omni's* paradigmatic example of weaponized process was not a lawsuit, but rather "objections to the license application of a competitor." 499 U.S. at 380; *see also Primetime 24 Joint Venture v. Nat'l Broad., Co.,* 219 F.3d 92, 101 (2d Cir. 2000) (FCC signal strength challenges); *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 180 (3d Cir. 2015) (objections submitted to the New Jersey environmental agency). And in *California Motor Transport Company v. Trucking Unlimited,* 404 U.S. 508 (1972)—from which *USS-POSCO* derived its approach—the "pattern" of petitioning activity encompassed hearings, reviews, and appeals from agency decisions. *Id.* at 509, 511. There, highway carriers instituted "administrative and judicial proceedings" to "harass and deter" other competing highway carriers from

obtaining licenses. *Id.* at 511. These activities "extend[ed] to rehearings and to reviews or appeals from agency or court decisions on these matters." *Id.* at 509. So too here, this Court should count pre-litigation challenges during administrative proceedings, as well as judicial challenges, in analyzing whether a sham pattern existed. As the district court had initially recognized, "throughout each matter, [Defendants] filed multiple objections and appeals with different government agencies, and viewing each suit as just one instance of sham litigation activity impermissibly oversimplifies the analysis." (1-ER-58.)

Even if this Court accepts Defendants' argument, advanced below, that some proceedings should not count because they were necessary to satisfy CEQA exhaustion requirements (which Relevant strongly disputes, given *Cal. Motor* and its progeny), the total number remains at least seven. At least three challenges had nothing to do with CEQA administrative exhaustion: (i) the administrative challenge to a demolition permit related to the Thompson project; (ii) the administrative challenge to an owner-participation agreement for the Thompson project; and (iii) the letter to prosecutors. *See supra* at 12–13, 23. In all events, the district court's decision to count only four proceedings reflects a conceptual error.

More fundamentally, the district court's second summary-judgment opinion errs in presuming that the *USS-POSCO* approach is a mere counting exercise. This Court has never imposed—and should not now impose—a bright-line rule for the

number of petitions that trigger *USS-POSCO*. "[I]t is not the number of claims which is controlling, but whether the evidence shows that the claim or claims filed constitute an abuse of process." *Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.,* 690 F.2d 1240, 1256 n.25 (9th Cir. 1982). Put otherwise, "when purported sham litigation encompasses a series of legal proceedings rather than a singular legal action, … the focus is not on any single case. Rather a district court should conduct a holistic evaluation of whether 'the administrative and judicial processes have been abused.'" *Waugh Chapel S., LLC v. United Food & Com. Workers Union Local 27,* 728 F.3d 354, 363–64 (4th Cir. 2013) (quoting *Cal. Motor Transp.,* 404 U.S. at 513). In conducting that "holistic evaluation," the number of proceedings is only one dimension—breadth and length are relevant, too.

Thus, even four proceedings can reveal a pattern of abusing process. In *Hanover,* for example, the Third Circuit applied the *USS-POSCO* exception based on four administrative proceedings that the defendants had brought to block a potential competitor from entering the subject market, as the defendants had "filed these sham proceedings at every opportunity to obstruct [the plaintiff] from obtaining all necessary government approvals." 806 F.3d at 162. And yet, when considering length and breadth and not merely the number of proceedings, this case involves far more process than did *Hanover*. In *Hanover,* one project was subjected to four administrative challenges. Here, four projects were subjected to multiple

challenges, including administrative challenges, correspondence to state and federal prosecutors, and three separate lawsuits. Defendants availed themselves of a sprawling, multifarious process that spanned eight years and at least nine different tribunals, (*see* 7-ER-1368 ¶ 13, 1370 ¶ 18, 1375 ¶ 36, 1376–77 ¶ 40, 1377–78 ¶ 41– 43, 1380 ¶ 48, 1384–85 ¶ 71, 1387 ¶ 85, 1391 ¶¶ 107–109, 1393–94 ¶ 120, 1394–95 ¶ 123, 1395–96 ¶ 126, 1396–97 ¶ 130, 1398–99 ¶ 137); and Defendants churned out those "claims" by copying and pasting the same objections from one project to the next, (*see* 7-ER-1380 ¶¶ 50–51, 1382 ¶ 58, 1388 ¶¶ 90-92, 1391 ¶¶ 105–107.) Although this voluminous process can fairly be categorized into four predicate acts for RICO purposes, it cannot sensibly be described as comprising only four proceedings under *Noerr-Pennington*.

Defendants' actions here created precisely the kind of scenario where the overall volume of process can inflict a "crushing burden," *USS-POSCO,* 31 F.3d at 811, and "impose expense and delay," *Omni,* 499 U.S. at 380. The challenges' mere pendency precluded Relevant from obtaining the funding necessary to complete its projects. In other words, the process itself (and not its outcome) put insurmountable pressure on Relevant. A reasonable jury could find that Defendants deliberately wielded process as a weapon, as evidenced by Defendants' counsel's threat that even if Relevant prevailed on any given challenge, Defendants could always "find something else to challenge." (7-ER-1383 ¶¶ 64–65.) It would be hard to script a

statement more demonstrative of a defendant's intent to use process itself—as opposed that process's outcome—as a weapon. *See Omni,* 499 U.S. at 380. As the district court initially recognized, Defendants' automatic opposition without regard to the merits put this case squarely within *USS-POSCO*'s ambit. (1-ER-91–93, 57–61.) The court erred in overruling that initial conclusion.

## B. Under the Series Exception to *Noerr-Pennington*, Triable Fact Issues Preclude Summary Judgment.

A rational jury could have found that Defendants used tactics to maximize the delay—and thus the collateral costs—of the process, and specifically that Defendants: (i) repeatedly and reflexively filed baseless, kitchen-sink objections to Relevant's projects; (ii) had no actual interest in their positions' merits, or in achieving a successful CEQA outcome; and (iii) did not prevail on the merits and demanded a payoff that was not achievable as a litigation outcome. Accordingly, because a rational factfinder could have concluded that Defendants made legal filings "not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment," *see USS-POSCO*, 31 F.3d at 811, the district court erred in granting summary judgment to Defendants' based on their *Noerr-Pennington* defense.

## 1. Defendants Repeatedly and Reflexively Challenged Relevant's Projects.

From 2015 through this suit's filing, Defendants systematically challenged, or

attempted to challenge, Relevant's hotel projects with a baseless, kitchen-sink approach that maximized process-related harm. With the Thompson, Tommie, Selma, and Schrader projects, Defendants filed objections throughout the City's entitlements and approvals process, including at zoning administration hearings, the City Planning Commission, the Planning and Land Use Committee, and the City Council. The objections comprised reams of boilerplate arguments. Many submissions approached several hundred pages, and Defendants merely copied and pasted the same form objections without regard for differences between the projects. (7-ER-1380 ¶¶ 50–51, 1382 ¶ 58, 1388 ¶¶ 90–92, 1391 ¶¶ 105–107, 1393–94 ¶¶ 120–122, 7-ER-1563 (attaching appendix in which "letters are highlighted to show repetitions from comments on prior hotels").) Defendants even filed objections regarding a demolition permit for a building that had already been demolished; unsurprisingly, several governmental bodies rejected that objection. (7-ER-1376–78 ¶¶ 40–43; 4-ER-559, 767 ("demolition and sewer cap work was completed, and a final inspection for these permits was approved on April 6, 2016").)

Once the City rejected Defendants' objections (usually by unanimous vote) and approved Relevant's projects, Defendants simply filed suit in Superior Court using the same template and scattershot approach, alleging significant impacts under every environmental impact category listed in the CEQA guidelines, without meaningful supporting allegations. (7-ER-1375–76 ¶¶ 36–39, 1378–80 ¶¶ 44–47,

1384–85 ¶¶ 71–74, 1395–96 ¶¶ 126–129, 1398 ¶ 135, *see also* 7-ER-1542–43.)

Defendants then sought to protract these proceedings, *i.e.,* to delay any outcome. (7-ER-1383–84 ¶¶ 67–68, 1394 ¶ 122, 1397–98 ¶¶ 133–134, *see also* 7-ER-1542–48.) Underscoring that process (not outcome) drove Defendants' strategy, Defendants dropped their objections to the Schrader project upon learning from KOAR that Relevant no longer had an interest in the Schrader project and that, unlike Relevant, KOAR was self-funded and under no time pressure to start construction. (7-ER-1391 ¶¶ 105–109, 1391–93 ¶¶ 111–117; 6-ER-1256–62, 1263–71.)

### 2. Defendants Had No Genuine Interest in Their Claims' Merits or in Achieving a Successful CEQA Outcome.

The summary-judgment record also establishes that Defendants had no genuine interest in the arguments they were advancing or in the outcome they ostensibly sought: additional environmental review. This case does not feature a litigant asserting a potentially valid private right, such as a patent- or copyright-holder acting to protect its intellectual property. *Cf., e.g., ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1291–92 (Fed. Cir. 2010) (patent); *PREI,* 508 U.S. at 50 (copyright). Rather, Defendants raised pretextual environmental and public-policy concerns as cover to inflict collateral harm on Relevant—delaying its projects and endangering its financing—and then demanded a payoff in order to remove the process-based knife Defendants had at Relevant's throat. Nourmand has no record—either before or after beginning his campaign

43

against Relevant—of any involvement in environmental issues. (7-ER-1373 ¶ 27, 7-ER-1417 ¶ 8.) See *supra* at 9–10. And his arguments were plainly insincere. For instance, even while owning and renting space to Boulevard3—one of the largest nightclubs in Hollywood, which featured live dancers and offered bottle service—Defendants railed against "party hotels" and nightclubs that would attract the wrong "kind of people." (7-ER-1371 ¶ 22, 1372 ¶ 25, 1382 ¶¶ 58–59, 1385 ¶ 75, 1388 ¶ 92, 1391 ¶ 107, 7-ER-1506:2-7, 1510:1–1511:9.) The photos of Boulevard3 speak volumes. (2-ER-258–87.) Defendants also complained about the development's impact on the neighborhood while negotiating to have a large outside developer redevelop Defendants' own property. (7-ER-1372 ¶ 25, 1373 ¶ 27, 1397 ¶ 132.) Their objections' pretextual nature was further confirmed when Defendants challenged the Thompson project even before seeing the environmental study that they claimed was inadequate. (7-ER-1370 ¶¶ 19–20, 1391 ¶¶ 105–107; 1486 ¶ 95; 2-ER-186–89, 190–192, 193-218; 6-ER-1099; *see also* 2-ER-194 ("I spoke with my consultant friend. He suggested the same thing that I thought. Simply enter our concerns into the record").)

In settlement, Defendants demanded concessions that would benefit their business interests, at the expense of the public they purported to represent in the CEQA litigations. This strategy included securing agreement from Relevant to forgo CEQA challenges to Defendants' own future developments, which is the antithesis

of CEQA's animating purpose. (7-ER-1372–73 ¶ 26, 1387 ¶ 83; 2-ER-140–69; 5-ER-1033–71.) Defendants pointedly did not ask for further environmental review, or for Relevant to address the dozens of purported environmental objections that Defendants had advanced. (7-ER-1372–73 ¶ 26, 1387 ¶ 83.) And when Relevant offered to complete an EIR for the Thompson project—the relief purportedly sought in the *Thompson* CEQA litigation—Defendants made clear that they would challenge, sight unseen, any EIR too. As Defendants' attorney Robert Silverstein put it, he could always "find something else to challenge." (7-ER-1383 ¶¶ 64–65, 1408 ¶ 9, 1402 ¶ 8.) See *supra* at 16–17.

Defendants also declined to bring objections against other developers. While claiming to care about traffic and climate change, Defendants did not challenge the nearby Crossroads project, a $1 billion, eight-acre development that would have been ten times larger than anything Relevant had proposed. (7-ER-1397 ¶¶ 131–132; 6-ER-1293–96.) Nourmand was negotiating a lucrative deal with the Crossroads developer to develop the Sunset Property in the same time frame he was objecting to the Selma and Schrader projects. (7-ER-1397 ¶¶ 131–132, 1490 ¶¶ 118–119.)

### 3. Defendants' Objections Were Brought Without Regard to Merit and Did Not Succeed on the Merits.

Defendants did not prevail at any level of the City's administrative process. The City Planning Commission, the City Planning and Land Use Committee, and the City Council uniformly rejected their objections. (7-ER-1375 ¶ 35, 1382 ¶ 62,

1395 ¶ 124.) Defendants' effort to invalidate Relevant's demolition permit for the Thompson Hotel was rejected multiple times, with the Central Area Planning Commission sharply criticizing the substantively and procedurally improper challenge. (7-ER-1377–78 ¶ 41–43.) Defendants' effort to involve prosecutors also failed. (7-ER- 1394–95 ¶ 123.)

Defendants were equally unsuccessful in litigation. Between 2016 and 2019, Defendants filed three petitions in Superior Court challenging Relevant's hotel projects. In each petition, Defendants sought injunctive and equitable relief to set aside the applicable MNDs and to order the City to prepare an EIR for each project. (7-ER-1542–43.) Yet no court *ever* ordered an EIR—the only outcome that Defendants requested. (7-ER-1549–58.) Every court that reached the merits of Defendants' claims (or similar claims) expressly allowed Relevant to proceed with construction pursuant to the applicable MND. (7-ER-1553, 1558.)

Defendants' initial petitions included generic arguments brought without regard to merit. (7-ER-1542–43.) Later filings parroted the prior failed objections. (7-ER-1542–43.) Despite their volume, Defendants' submissions never evidenced specific environmental impacts, instead reciting all the impact categories listed in CEQA guidelines. (7-ER-1542–43, 1549–58.) Defendants abandoned most of their allegations during the course of litigation, never even attempting to support them in briefing let alone with proof. (7-ER-1542–43, 1549–58.) *See Waugh Chapel,* 728

F.3d at 363–64 (observing that withdrawing arguments exposes their lack of merit).

Although Defendants achieved various interlocutory and procedural rulings on collateral issues, a rational factfinder could recognize that these rulings only enabled Defendants to protract the process without achieving success on the merits. In *Thompson,* for example, Defendants' claimed victory is a tentative ruling denying the City's motion to augment the administrative record. A year and a half into the litigation, Defendants claimed to discover that elements on the building rooftop (such as the pool's location) had been moved during the planning process and necessitated a continuance to the trial date. (7-ER-1383–84 ¶¶ 67–68.) Yet these changes had been made at Nourmand's request, and the plans had been made available to Nourmand years before. (7-ER-1374 ¶ 31.) See *supra* at 10–11. The City sought to augment the administrative record to include evidence addressing this argument, but the motion was denied. (7-ER-1545–46.) The tentative ruling impacted only the City's exhaustion defense, not the petition's merits. (7-ER-1545–46.) The *Thompson* court never granted any relief sought in the petition or required an EIR to proceed. (7-ER-1545–46, 1487 ¶ 100.) This dubious motion practice hardly shows that the underlying claims were brought in good faith at the outset.

In *Tommie,* the claimed win is not even Defendants'—it involves a separate lawsuit brought by Elle Farmer, a union organizer. This interlocutory decision was not a CEQA win for Ms. Farmer or for Defendants. The *Farmer* court did not order

the City to prepare an EIR; it ordered an interlocutory remand so the City could clarify the MND, and Relevant proceeded with construction. (7-ER-1553.)

In *Selma,* the court rejected the overwhelming number of Defendants' claims, describing them as meritless and wholly lacking evidentiary support. (7-ER-1554–57.) On the two arguments as to which Defendants claim victory, the court remanded those issues to the City for "clarif[ication]" and allowed construction to proceed. (7-ER-1554.) Tellingly, Defendants appealed the order that they now call a win—and then they lost on appeal. (7-ER-1558.) A rational factfinder could conclude that such a result is not a victory.

Nor are the settlement agreements evidence that Defendants' claims had merit. As a policy matter, if a victim's ransom payment precluded application of the sham litigation exception to *Noerr-Pennington,* successful extortioners would be immune while failed extortioners would be liable. Such perversity has no grounding in the Supreme Court's or the Ninth Circuit's articulation of the policies underlying the exception. The sham exception's purpose is to prevent a party from weaponizing process "to impose expense and delay," *Omni,* 499 U.S. at 380, which can put a "crushing burden" on the victim, *USS-POSCO,* 31 F.3d at 811. A victim facing ruin will pay anything to avoid it—and where the threat of ruin comes from the litigation process, that means settlement. Far from *disproving* sham litigation, a settlement can *prove* sham when, as here, there is an "incongruity" between what the victim is

paying and what the extortioner could achieve as a litigation outcome. *See United States v. Koziol*, 993 F.3d 1160, 1172 n.12 (9th Cir. 2021) (holding that "the incongruity between his settlement demands and the complaint would be probative evidence of sham litigation"). That incongruity shows that the victim is paying to avoid "process—as opposed to the outcome of that process," *Omni,* 499 U.S. at 380, which deactivates *Noerr-Pennington*.

Here, there is indeed a stark incongruity between the payoff Defendants sought and obtained. Defendants demanded concessions they could never get (and did not even seek) in a CEQA action. (7-ER-1387 ¶¶ 81–83; 2-ER-125 19–2-ER-126 19, 127 19-24.) Monetary damages are not available in CEQA cases. And Defendants' naked weaponization of CEQA did not even have a fig leaf: "You know the drill. It will take a check to make this go away." (7-ER-1404 ¶ 15.) Defendants demanded the extraordinary sum of $5.5 million, none of which was attorneys' fees, and all of which was claimed for tax purposes as "economic harm." (7-ER-1387 ¶ 81, 1489 ¶ 115.) The settlement barred Relevant from challenging Defendants' development proposals in the future—something that is not only not obtainable in a CEQA case, but is contrary to the very premise of CEQA. (7-ER-1387 ¶ 83, 1560–61.) Defendants also demanded a host of changes to the Tommie and Thompson Hotels that did not reduce any purported environmental impacts on the public, but that simply benefited Defendants' property. (7-ER-1387 ¶ 83; 2-ER-136–39; 5-ER-

1033.) The settlements did not include typical CEQA provisions, such as mitigation efforts or an EIR—that is, the settlements did not give Defendants the outcome that they ostensibly sought in the CEQA suits. (7-ER-1387 ¶ 83, 1560–61.) And the City of Los Angeles, the actual party to the CEQA suits, was not involved in, or a party to, the settlements—in fact, the agreements prohibited Relevant from reporting the settlements' terms to the City. (7-ER-1387 ¶ 83, 1560–61; 2-ER-136–39.)

A rational jury could find that Defendants' obtained this incongruous result because their abuse of process pushed Relevant to the brink of financial ruin. The CEQA litigation's mere pendency prevented Relevant from securing financing and commencing construction. (7-ER-1535–37.) Existing investors threatened to pull out if construction did not begin. (7-ER-1535–37.) Defendants knew of that vulnerability to delay and understood that it made the CEQA *process* a weapon. (7-ER-1374–75 ¶ 32.) And they made clear that they would do whatever they could to protract the process: if Relevant won at trial, Defendants would appeal and thus drag the case out by another year to eighteen months; if Defendants prevailed and Relevant prepared an EIR, Defendants would challenge that, too. They put this threat in writing, making clear that *delay* was the reason to pay Defendants' demand:

> [I]f we are successful in the litigation, and assuming you [do] an EIR, the *developer needs an additional two years to process the project, with many of the same challenges going forward.* In the end … there is a balance that needs to be struck between the preferred construction outcome, and the economic impact we assess to have occurred on the HAC property. … My hope is that once there is a *hard-pencil costing assessment* done by the developer, that you

will see what that balance looks like, and we will have a productive discussion going forward.

(7-ER-1386 ¶¶ 77–78; 2-ER-362–66; 7-ER-1419, 1417 ¶¶ 5–7) (emphasis added). A rational jury could read that email as threatening continued delay and suggesting that Relevant should calculate the financial cost of those further delays when considering Defendants' demands, including the monetary demand. (7-ER-1417 ¶¶ 5–7.) At a minimum, it is a jury question whether, in extracting a settlement from Relevant, Defendants were weaponizing process.

Even if the settlement agreements could be seen as evidence of the merit of some particular claim or filing, that would not preclude the sham litigation exception. As the district court had initially reasoned, it would make no sense to calculate Defendants' "batting average" by looking at *cases* rather than *claims.* (1-ER-55–57.) If a gambler places a chip on every number on the roulette table, the fact that the ball lands on one of those numbers does not mean the gambler made a successful bet. *See USS-POSCO,* 31 F.3d at 812 (The "occasional success" of a sham claim is "irrelevant" because even a "broken clock is right twice a day."); *see also Hanover,* 806 F.3d at 180-81 (a claimant's batting average is only "circumstantial evidence"). Such a betting strategy would suggest some sham was afoot. So too with Defendants' kitchen-sink objections. Defendants' "win" had nothing to do with their objections' merit and everything to do with their volume.

### C. Even Under the Objectively-Baseless Exception, Summary Judgment Should Have Been Denied.

Even if the second summary-judgment opinion is correct that the *PREI* exception applies, the above analysis demonstrates disputed factual issues on whether the underlying lawsuits were objectively baseless, thus precluding summary judgment. Defendants' administrative claims were meritless and uniformly rejected. In the CEQA litigation, no court ordered an EIR, and Defendants' purported "wins" were not actually victorious outcomes. And the settlements here show only that the litigation's collateral consequences were so severe that it forced one side to settle a claim for reasons unrelated to the merits.

The district court also overlooked the principle that when a single lawsuit contains multiple distinct claims, the fact that one claim might have merit is insufficient to prove that the suit is not baseless; rather, the factfinder must consider the complaint as a whole. *See In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class,* 868 F.3d 132, 156 n.34 (3d Cir. 2017) ("When considering whether a petition is entitled to immunity, courts should consider whether the petition as a whole is objectively baseless."). A contrary rule would immunize a party that bolted dozens of frivolous, misjoined, process-intensive claims onto a single, trivial but non-frivolous claim and then used the process to achieve an improper goal—while *not* immunizing a party that filed the exact same claims in separate actions.

*PREI* itself harmonizes with Relevant's position. There, the underlying

allegedly sham proceeding was a simple claim for copyright infringement by a conceded copyright owner in a context where the law was "unsettled," such that the underlying plaintiff "plainly had probable cause to sue." 508 U.S. at 51–53, 64–65. That proceeding did not involve the kind of blunderbuss petitioning involved here.

## II.    The District Court Exceeded Its Authority in *Sua Sponte* Overruling the Court's Prior Summary Judgment Order.

"[O]ne judge should not overrule the prior decisions of another sitting in the same case." *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 530 (9th Cir. 2000). That rule is essential to "preserve the orderly functioning of the judicial process." *Id.* (punctuation omitted). A prior judge's ruling should be overruled only "for the most cogent reasons," *see United States v. Desert Gold Mining Co.*, 433 F.2d 713, 715 (9th Cir. 1970), such as when the intervening law has changed, new evidence has emerged, or the prior decision "is clearly erroneous and would work a manifest injustice," *see Pit River Home & Agr. Co-op. Ass'n v. United States*, 30 F.3d 1088, 1097 (9th Cir. 1994) (applying the law-of-the-case doctrine to an interlocutory order); *see also Delta Sav. Bank v. United States*, 265 F.3d 1017, 1027 (9th Cir. 2001) ("We review for abuse of discretion a district judge's decision to reconsider an interlocutory order by another judge of the same court.").

In a circumstance like ours—that is, when a new judge overrules a critical holding of a prior judge in the same case, which the prior judge rendered several times—this Court's precedents teach that the new judge has committed an abuse of

discretion unless an adequate justification exists, such as an intervening change in the law, the emergence of new evidence, or if the prior holding was clearly erroneous and would cause manifest injustice. Put differently, the law-of-the-the case doctrine—or, at least, the principles underlying the doctrine—should apply to an exceptional circumstance like ours: specifically, where a later judge in the same case has overturned a critical holding that a prior judge has rendered several times, even without a change in the law, additional factual development, or a clear error in the prior holding that would cause manifest injustice.

Under these governing principles, in issuing the second summary-judgment order and overruling the first summary-judgment order, the court abused its discretion. Chief Judge Gutierrez expressly stated that he was overruling Judge Wright II because the prior order was "erroneous and, if upheld, would endanger core constitutional rights." (1-ER-12.) But the difference between "clear error" and "error" is meaningful—and often dispositive. Litigants who seek to alter judgments under Federal Rule of Civil Procedure 59(e) routinely learn this lesson the hard way: to prevail, they must show that the court *clearly* erred, not only that the court erred. *See, e.g.*, *Kaufmann v. Kijakazi*, 32 F.4th 843, 846 (9th Cir. 2022). Hard truths should cut both ways. In addition, as this brief's substantive argument demonstrates, the initial summary-judgment denial could not have been *clearly* erroneous and could not have caused manifest injustice. Far from it, the summary-judgment denial was

correct. See *supra* Argument, Part I (at 35–53). In overruling its own repeated and critical holding on the ground that it was erroneous, absent a showing that the prior holding was *clearly* erroneous and would generate manifest injustice, the court exceeded its authority and committed an error that demands vacatur.

This Court's guidance in *Pit River Home* is instructive. There, this Court rejected the argument that "the law of the case doctrine does not apply to interlocutory orders which are not immediately appealable," noting that the "doctrine is a discretionary one created to maintain consistency and avoid reconsideration, during the course of a single continuing lawsuit, of those decisions that are intended to put a matter to rest." *Pit River Home & Agr. Co-op. Ass'n v. United States*, 30 F.3d 1088, 1094 (9th Cir. 1994). The district court here put the matter at hand—the applicability of the *Noerr-Pennington* series exception to Defendants' petitioning activities—to rest no less than three times.

*Peralta* is not to the contrary. There, this Court, sitting *en banc*, held that the district court did not abuse its discretion when it denied the defendants' motion for summary judgment but then, after trial, granted them judgment as a matter of law. *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014). According to this Court, the denial could not calcify into the law of the case because "factual development of the case [was] still ongoing," and although the denial was prompted by a "factual dispute at the time," that dispute "disappear[ed] as the record develop[ed]" during trial. *Id.*

Here, however, the district court did not overturn its denial of summary judgment based on any factual development or new evidence—or, for that matter, based on a change in law or any clear error. Nor did the Defendants challenge the denial, either through motion practice in the district court or by seeking interlocutory review in this Court, *see* 28 U.S.C. § 1292(b). Rather, the district court *sua sponte* gave the case a fresh look and changed its mind—as if the court were an individual, rather than an institution. As *The Law of Judicial Precedent* puts the point:

> May the new judges give a fresh look at the case and ignore or effectively overturn rulings by their predecessors with which they disagree? No. The key reason is that courts, not judges, issue rulings. That is why all judges wear the same black robes—to signify that the one institution defines the rule of law, not the varied people behind it. Each court and each judge is bound by prior judgments and holdings of *that court*, no matter which judge or group of judges issued the earlier ruling.

Bryan A. Garner et al., *The Law of Judicial Precedent* 475 (2016). At bottom, the second summary-judgment order in this case flouts the bedrock principle that courts, not individual judges, render legal holdings.

## CONCLUSION

The district court's grant of summary judgment for Defendants should be vacated and the case should be remanded for trial. Alternatively, the grant of summary judgment should be vacated and the case should be remanded for reconsideration of summary judgment under the *USS-POSCO* standard.

Dated:  November 9, 2023                    KASOWITZ BENSON TORRES LLP

By: /s/ Jennifer S. Recine

Jennifer S. Recine
Amit R. Vora
Donald J. Reinhard
1633 Broadway
New York, NY 10019
Telephone: (212) 506-1700
Facsimile:  (212) 506-1800
JRecine@kasowitz.com

*Attorneys for Appellants*
*Relevant Group, LLC, 1541 Wilcox*
*Hotel, LLC, 6516 Tommie Hotel, LLC,*
*and 6421 Selma Wilcox Hotel, LLC*

**STATEMENT OF RELATED CASES**

Appellants are not aware of any related cases pursuant to Federal Rule of Appellate Procedure 28-2.6.

Dated: November 9, 2023

KASOWITZ BENSON TORRES LLP

*/s/ Jennifer S. Recine*
Jennifer S. Recine

*Counsel for Appellants Relevant Group, LLC, 1541 Wilcox Hotel, LLC, 6516 Tommie Hotel, LLC, and 6421 Selma Wilcox Hotel, LLC*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Circuit Rule 32-1, I hereby certify that this brief contains 13,125 words and was prepared in a proportionately spaced 14-point font typeface using Microsoft Word 2013. The brief's type size and typeface comply with Federal Rule of Appellate Procedure 32(a)(5) and (6).

Dated:  November 9, 2023

KASOWITZ BENSON TORRES LLP

*/s/ Jennifer S. Recine*
Jennifer S. Recine

*Counsel for Appellants Relevant Group, LLC, 1541 Wilcox Hotel, LLC, 6516 Tommie Hotel, LLC, and 6421 Selma Wilcox Hotel, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: November 9, 2023

KASOWITZ BENSON TORRES LLP

*/s/ Jennifer S. Recine*
Jennifer S. Recine

*Counsel for Appellants Relevant Group, LLC, 1541 Wilcox Hotel, LLC, 6516 Tommie Hotel, LLC, and 6421 Selma Wilcox Hotel, LLC*

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

RELEVANT GROUP, LLC, 1541 WILCOX HOTEL, LLC, 6516 TOMMIE
HOTEL, LLC, and 6421 SELMA WILCOX HOTEL, LLC,

Plaintiffs/Appellants,

v.

STEPHEN "SAEED" NOURMAND, SUNSET LANDMARK INVESTMENT,
LLC, NOURMAND AND ASSOCIATES, and DOES 1-10,

Respondents/Appellees.

On Appeal from the United States District Court for the
Central District of California (Hon. Philip S. Gutierrez)
Case No. 2:19-cv-05019-PSG-KS

**ADDENDUM**

Jennifer S. Recine
Amit R. Vora
Donald J. Reinhard
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
JRecine@kasowitz.com
(212) 506-1700

*Counsel for Appellants Relevant Group,
LLC, 1541 Wilcox Hotel, LLC, 6516
Tommie Hotel, LLC, and 6421 Selma
Wilcox Hotel, LLC*

# INDEX TO ADDENDUM

## Pertinent Statutory and Constitutional Authorities

**Page**

U.S. CONST., AMEND. I ............................................................. A-1

CAL. PUB. RES. CODE § 21061 ................................................... A-2

CAL. PUB. RES. CODE § 21064 ................................................... A-3

CAL. PUB. RES. CODE § 21064.5 ................................................ A-4

## U.S. CONST., AMEND. I

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

# Cal. Pub. Res. Code § 21061

"Environmental impact report" means a detailed statement setting forth the matters specified in Sections 21100 and 21100.1; provided that information or data which is relevant to such a statement and is a matter of public record or is generally available to the public need not be repeated in its entirety in such statement, but may be specifically cited as the source for conclusions stated therein; and provided further that such information or data shall be briefly described, that its relationship to the environmental impact report shall be indicated, and that the source thereof shall be reasonably available for inspection at a public place or public building. An environmental impact report also includes any comments which are obtained pursuant to Section 21104 or 21153, or which are required to be obtained pursuant to this division.

An environmental impact report is an informational document which, when its preparation is required by this division, shall be considered by every public agency prior to its approval or disapproval of a project. The purpose of an environmental impact report is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.

In order to facilitate the use of environmental impact reports, public agencies shall require that such reports contain an index or table of contents and a summary. Failure to include such index, table of contents, or summary shall not constitute a cause of action pursuant to Section 21167.

## Cal. Pub. Res. Code § 21064

"Negative declaration" means a written statement briefly describing the reasons that a proposed project will not have a significant effect on the environment and does not require the preparation of an environmental impact report.

## CAL. PUB. RES. CODE § 21064.5

"Mitigated negative declaration" means a negative declaration prepared for a project when the initial study has identified potentially significant effects on the environment, but (1) revisions in the project plans or proposals made by, or agreed to by, the applicant before the proposed negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur, and (2) there is no substantial evidence in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment.